### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-10255-01 |
| | ) | |
| v. | ) | 06-3165-MLB |
| | ) | |
| | ) | |
| LARRY RAIFSNIDER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM AND ORDER

Before the court are the following:

1. Defendant's motion pursuant to 28 U.S.C. § 2255 (Docs. 38 and 39);

2. Defendant's motion for appointment of counsel (Doc. 41);

3. Government's motion to dismiss (Doc. 43);

4. Government's amended motion to dismiss (Doc. 46);

5. Defendant's motion for leave to amend (Doc. 47);

6. Defendant's motion for extension of time (Doc. 48);

7. Defendant's amended motion pursuant to 28 U.S.C. § 2255 (Doc. 49); and

8. Defendant's traverse (Doc. 50).

A hearing was held on March 5, 2007. Defendant testified and was represented by appointed counsel.

The files and records show the following:

### Defendant's 2255 Motion

Defendant filed his 2255 motion on June 16, 2006 (Docs. 38 and 39). He raised four grounds: (1) ineffective assistance of counsel; (2) lack of jurisdiction by this court; (3) and (4) unlawful

extradition from Oklahoma to Kansas.  Defendant attached an "Affidavit and Statement of Facts" and a "Memorandum of Law" which charitably can be described as rambling, exaggerated, self-serving, and, to some extent, untrue versions of the events following his arrest in Bartlesville, Oklahoma through the proceedings in this court (Docs. 38 and 39).  In his amended motion (Doc. 49), defendant expands on his claim that he was kidnapped in Oklahoma, concluding that this court therefore lacked jurisdiction to entertain his pleas and impose sentence.  In other words, the amended motion contains nothing new.

<u>Presentence Report</u>[1]

The presentence report sets forth the following unobjected to information regarding defendant.  When he was sentenced in June 2005, defendant was 40 years old.  He told the probation officer that he had received bachelors and masters degrees from Portland University in Portland, Oregon.  However, Portland University has no record that defendant ever attended there under his name or under any of his twenty or more aliases.

Defendant has twenty-four criminal history points yielding a criminal history category of VI based upon convictions for burglary, stealing, escape, grand theft, domestic assault and theft by deception.

After his arrest, defendant told investigators that he had

---

[1]The presentence report may be utilized when considering a § 2255 motion to determine the factual basis for a guilty plea.  <u>United States v. Wainuskis</u>, 138 F.3d 183, 185 (5th Cir. 1998).  In addition, one of defendant's main contentions is that he pled guilty "out of fear."  The information contained in the presentence report sheds considerable light on the verity of this claim by providing insight into defendant's credibility, character and background.

designed various toxins and explosives, that he had murdered for hire seven to eight persons in Mexico and Canada, that he had committed one of the murders for the Irish Republican Army using a blowgun dart with poison from the Brazilian frog, that he had done work for John Gotti, that he had supplied agents for foreign governments with information regarding U.S. government installations, that he had trained with Revolutionary Army of Columbia along with Timothy McVeigh, that he had instructed a group on counterfeiting and, in the process, had become privy to information regarding attacks on the United States by Hizballah, the Taliban and Al-Qaeda, among other things.

## Magistrate Court Proceedings

Defendant first appeared in Wichita before Chief U.S. Magistrate Judge Karen Humphreys on December 1, 2004, for a Fed. R. Crim. P. 5 hearing based on a complaint charging him with kidnapping (Docs. 1 and 53). Among other things, defendant told Judge Humphreys that he had a twelfth grade education, hardly the post-graduate level of education about which he bragged to the probation officer. He did not complain about being "kidnapped." Steve Gradert, an experienced federal public defender, was appointed to represent defendant.

On December 9, 2004, defendant was indicted on charges of kidnapping, possession of a firearm by a convicted felon, possession of ammunition by a convicted felon and possession of a firearm during a crime of violence (Doc. 5). On December 10, 2004, defendant again appeared before Judge Humphreys for arraignment (Doc. 54). Defendant acknowledged his understanding of the charges. He did not complain about being "kidnapped" or about Mr. Gradert's representation.

## Offense Conduct

-3-

The conduct giving rise to the Kansas charges is set forth in the presentence report and is unobjected to:

On Monday, November 29, 2004, at approximately 4:00 a.m., the defendant, who was wearing a mask and gloves burst into the Crockers bedroom, flipped on the lights and while pointing a handgun at the Crockers, began hollering at them to turn onto their stomachs. The defendant handcuffed both individuals with plastic ties. The defendant inquired about getting into a big safe which was in the home. J.D. Crocker gave the defendant the combination. The defendant left the room briefly but returned and indicated that he was unable to open the safe. Mr. Crocker, while still handcuffed, accompanied the defendant to the safe and opened it.

The defendant then inquired about getting into a smaller safe inside the residence. Although this safe was not locked, the defendant had turned the dial locking it. The defendant was able to open the small safe after obtaining the combination from Ms. Crocker. While out of the room, away from the Crockers, they heard the defendant talking to someone who the defendant would refer to as James. Although they never saw or heard another individual, the Crockers believed that another person was present. After taking the contents of the safes, the defendant advised the couple that he wanted to know the balance in their accounts at Bank of America and Arvest Bank. Although she could not remember the exact total, Ms. Crocker advised the defendant they each contained approximately $50,000. The defendant explained that he was going to take Ms. Crocker with him and have Mr. Crocker go to the banks, withdraw $50,000 from each bank, and subsequently meet them at the K-Mart in Bartlesville, Oklahoma.

After completing the withdrawal slip and having Mr. Crocker sign it, Ms. Crocker convinced the defendant that she would be better at handling the bank withdrawals. The defendant agreed, and subsequently left the residence taking Mr. Crocker as a hostage around 4:30 a.m. Ms. Crocker was told by the defendant to wait until 8:30 a.m. to travel to the Bank of America in Coffeyville, Kansas, and withdraw $50,000, then travel to the Arvest Bank in Bartlesville, Oklahoma, and withdraw another $50,000. She was instructed to meet the defendant in the K-Mart parking lot in Bartlesville, Oklahoma, subsequent, to the withdrawals. The defendant advised the Crockers that he had cut their phone lines so that Ms. Crocker could not call the authorities.

According to statements by Mr. Crocker, the defendant

-4-

escorted Mr. Crocker from the residence and put him in Mr.
Crocker's 2004 Chevrolet Avalanche.  Before leaving, the
defendant told Mrs. Crocker that his partner would be
following and watching her the entire trip.  The defendant
and Mr. Crocker traveled in Mr. Crocker's Avalanche to the
Industrial Park located across from the Crocker's barn,
where they changed vehicles entering a white Pontiac
Bonneville.  Mr. Crocker advised that the defendant removed
his mask and gloves and put on a red ball cap.


Initially, Mr. Crocker rode in the passenger side of
the vehicle.  The defendant allowed Mr. Crocker to take his
medicine and proceeded to drive him to a cemetery located
near Highway 99.  While in this cemetery, the defendant
pointed at a fresh pile of dirt and a steel box stating
"that's a cemetery and that is where I'm supposed to bury
you.  You behave and we'll go on."  According to Mr.
Crocker, the two left the cemetery and traveled to
Coffeyville where he showed Mr. Crocker the bank that Ms.
Crocker was supposed to go to first.  They subsequently
left Coffeyville traveling to Independence, Kansas.  On the
west side of Independence, just on the other side of
Highway 160 Underpass, the defendant stopped the car and
entered a building for approximately 15 minutes.  When he
returned, he made Mr. Crocker get into the backseat and
cover up with a white blanket.  The pair then traveled back
east toward town and stopped to fill up with gas at a
convenience store.  Mr. Crocker emphasized that while the
defendant was driving, he noticed a very distinguishable
tattoo on his left hand which appeared to be dots, a cross,
and another emblem.

As the pair traveled west on Highway 160, the
defendant pulled over to the side of the road.  He wiped
off several of Mr. Crocker's bank check cards and handed
them to him.  The defendant stated "we can empty your bank
account with these.  When we get through, go to the bank
and say they were stolen."  The defendant also noted that
he knew how much money in stocks Mr. Crocker and his wife
had in the bank.  The defendant stated in a threatening
manner "I am professional killer.  My boss in Kansas gives
me a job to do and I do it."

The pair proceeded to drive to Copan, Oklahoma, where
they drove over the Copan Dam and Hula Dam before stopping.
The defendant left the vehicle to make a call from a
payphone located there.  Mr. Crocker believed the defendant
was speaking with his partner who was supposed to be
watching his wife.  The defendant returned to the vehicle
and the pair proceeded south to Highway 99 and then back to
Bartlesville through Osage Park.  It was around 10:00 a.m.
when they arrived at the K-Mart parking lot.

Meanwhile, Ms. Crocker remained in the residence until approximately 8:30 a.m.  She then traveled to the Bank of America in Coffeyville arriving around 9:00 a.m.  She attempted to withdraw $50,000, however, they told her that they did not have that much cash there and sent her to the branch located at 8th and Buckeye, Coffeyville, Kansas. Ms. Crocker knew the manager at this bank who helped her withdraw $45,000.  Ms. Crocker subsequently left Coffeyville, arriving in Bartlesville, Oklahoma, around 10:00 a.m., at the Arvest Bank.  Officials with the Arvest Bank initially attempted to give Ms. Crocker a cashier's check, however, after a period of arguing, Ms. Crocker advised bank officials that she needed cash.

Officials with the bank observed that Ms. Crocker appeared shaken and that she had been crying.  They questioned her about what was going on.  Ms. Crocker subsequently advised bank officials that the defendant had broken into their home earlier that morning, that he was holding her husband hostage until such time that she could withdraw funds from their bank accounts.  Bank officials immediately contacted the local police department who arrived at the bank shortly thereafter.  Officers met with Ms. Crocker and directed her to meet with the defendant in the K-Mart parking lot and advise him that the bank was counting the money and to postpone their meeting.  Officers observed as Ms. Crocker exited the bank and traveled to the K-Mart parking lot, where the defendant was waiting in a nearby white Pontiac Bonneville.  The defendant honked his horn and Ms. Crocker approached the vehicle and got in.

Ms. Crocker advised the defendant that the bank was still counting the money and it would be ready around 12:30 p.m.  The defendant agreed and told her to meet with him again near the trees in the K-Mart parking lot at 12:30 p.m.  Ms. Crocker noted that her husband was in the backseat of the car, covered up with a blanket.  Ms. Crocker subsequently returned to the bank where she was provided money.  Ms. Crocker returned to the K-Mart parking lot under police surveillance, however, the defendant failed to show up.

Subsequent to their initial meeting, the defendant and Mr. Crocker parked near the bank.  The defendant observed Ms. Crocker exit the bank at approximately 12:40 p.m. and noticed that a woman was walking out with her.  The defendant noted "things don't look right."  The defendant then traveled to an elevated garage across from the K-Mart. He noticed that Ms. Crocker was parked where she was supposed to be but the woman was sitting in a white car parked nearby.  He also noticed several marked police cars in the area.  The defendant left the parking garage and traveled to a nearby park.  The defendant let Mr. Crocker

-6-

out, stating he would tell Ms. Crocker where he was. Mr. Crocker waited a few minutes and then waved down a passing car. Mr. Crocker asked the man to call the police and check on his wife's vehicle in the K-Mart parking lot. According to the defendant's statements subsequent to his arrest, he traveled a short distance from the park, where he exchanged license plates on his vehicle. The defendant then decided to return to the park to provide Mr. Crocker with a jacket. He was stopped by police near the park and taken into custody.

\* \* \*

Moreover, the Crockers report having experienced a significant amount of emotional trauma throughout the course of this offense. The Crockers note "[b]ecause of this incident, we have had to sell our dream retirement home, a beautiful spot of 80 acres on a hill one mile from Caney [Kansas]. We have had to relocate to a larger city where there is more security. After having been awakened by a masked man with a gun at my head, I feel we have been robbed of our safety and security for the rest of our lives. There is no monetary value to replace this. It has been 6 months since this incident and my wife still cries when she thinks about it or talks about it. We will never get over it; internal wound for life." The victims denied that Mr. Raifsnider ever physically assaulted them.

(PSI at 12-14, 19).

## Central District of Illinois Charges (Case No. 05-10052)

On September 6, 2002, defendant was indicted in the Central District of Illinois on two counts of bank fraud, one count of possession of a false security and one count of use of a fraudulent social security card with intent to deceive.

## District Court Proceedings

On April 4, 2005, defendant appeared with Mr. Gradert to enter guilty pleas pursuant to Fed. R. Crim. P. 11(c)(1)(C) to the District of Kansas charges and, pursuant to Rule 20, to the Central District of Illinois charges. The pleas were made under oath pursuant to written plea agreements (Docs. 5 and 14). In addition, defendant signed and swore to written petitions to enter a guilty plea (Docs.

-7-

6 and 15).   Finally, Doc. 18 is a transcript of the April 4
proceeding.

Pursuant to the District of Kansas plea agreement, defendant
entered a plea of guilty to kidnapping in violation of 18 U.S.C. §
1201 and brandishing a firearm during and in relation to a crime of
violence in violation of 18 U.S.C. § 924(c).   The plea agreement sets
out the following offense conduct:

> Factual Basis for the Guilty Plea. The parties agree the
> facts constituting the offense to which the defendant is
> pleading guilty are as follows:
>
> > During the early morning hours of November 19,
> > 2004, the defendant broke into the house of J.D.
> > Crocker, with the intent to kidnap either J.D.
> > Crocker or his wife. After defendant broke into
> > the Crocker residence he restrained Mr. and Mrs.
> > Crocker and searched the house for valuables and
> > had Mr. Crocker open a safe located in the
> > Crocker residence. Inside the safe was a .22
> > caliber pistol, which had been purchased by Mr.
> > Crocker. Defendant took the handgun from the safe
> > and at all material times hereto possessed said
> > handgun. At some point in time, the defendant
> > informed Mrs. Crocker that he was kidnaping Mr.
> > Crocker and demanded Mrs. Crocker pay to the
> > defendant a ransom of $95,000.00 for the safe
> > return of Mr. Crocker. The defendant further
> > informed Mrs. Crocker that she was to meet him
> > (the defendant) with the money in Bartelsville,
> > Oklahoma and upon payment of the money to the
> > defendant that Mr. Crocker would be released. The
> > defendant then left the Crocker residence and
> > willfully and intentionally kidnaped and abducted
> > J.D. Crocker by forcing Mr. Crocker into an
> > automobile. The defendant then drove, with J.D.
> > Crocker, to Bartelsville, Oklahoma, where the
> > defendant was apprehended and J.D. Crocker as
> > [sic] released.
> >
> > After the defendant left the Crocker residence,
> > the defendant kept the .22 caliber pistol, which
> > he had stolen from the Crocker safe, on the
> > floorboard of his automobile. The possession of
> > the .22 caliber pistol furthered the kidnaping
> > [sic] of Mr. Crocker because Mr. Crocker knew
> > said pistol was real, operable and loaded.

-8-

> The .22 caliber Ruger handgun, stolen by the defendant from the Crocker safe, was manufactured in another State and had traveled in interstate commerce at the time it was purchased by Mr. Crocker in the State of Kansas.

(Doc. 14 at 2).

Defendant also entered a Rule 20 plea to the Central District of Illinois charges (Case No. 05-10052-01, Docs 5 and 6). That plea agreement states, in pertinent part: "The defendant understands that the maximum statutory sentence which may be imposed as to Count One is not more than thirty (30) years imprisonment . . . . The parties further agree to request a sentence consistent with the terms of this agreement. In other words, the United States will request that the sentence in this case be concurrent with the sentence of imprisonment imposed in <u>United States v. Larry L. Raifsnider</u>, Case Number 04-10255-01 filed in the District of Kansas, and the defendant will also request that the sentence of imprisonment imposed in this matter run concurrent with the sentence of imprisonment imposed in the District of Kansas case." (Case No. 05-10052-01, Doc. 5).

As required by the rules, the court addressed defendant directly and determined, among other things, that he understood the charges to which he intended to enter pleas of guilty, the potential punishments and, in particular, the impact of a Rule 11(c)(1)(C) plea which, in defendant's District of Kansas case, was to an agreed sentence of 30 years imprisonment. The court covered defendant's agreed-upon waiver of his right to file a § 2255 motion and in doing so, stated: "Let me tell you, as a practical matter, Mr. Raifsnider, the practical effect of this paragraph is that you are agreeing that you will never ask any

court anywhere to review your case.  You understand that?"  Defendant answered "yes sir."  The court also explained in some detail defendant's right to a trial and the rights he was giving up by entering pleas of guilty.  In open court, in the plea agreements and in the petitions to enter the pleas, defendant indicated <u>under</u> <u>oath</u> that he understood everything explained to him and contained in the documents he signed.  Defendant stated, both orally and in writing, that he had had sufficient time to discuss his case with his counsel and that he was satisfied with the way counsel was handling his case. Defendant said nothing which indicated that he was pleading guilty out of "fear," a claim he now raises.

<u>June 20, 2005 Proceedings</u>

After defendant's presentence report was prepared, defendant filed a motion to withdraw his pleas (Docs. 16 and 17).  Doc. 56 is a transcript of the hearing.  Defendant's counsel explained at some length his reasons for filing the motion, none of which included a claim of "fear" by defendant.  Mr. Gradert announced that his client wanted to withdraw the motion to withdraw the pleas.  The court addressed defendant as follows:

THE COURT: Well, what do you say, Mr. Raifsnider? You're apparently the one who got this all started.

DEFENDANT MR. RAIFSNIDER: I concur with my attorney's opinion, Your Honor.  I believed that what research I had was feasible grounds, I thought, that I'd have to be able to use as an appeal at another point in time; but when he pointed out to me the differences between the civil and the federal cases, I would agree with him that it would be more

-10-

of a better decision for me to go ahead with the plea and
continue the sentencing.

                            * * *

     THE COURT:  Well, let me tell you, Mr. Raifsnider,
and, as I say, I'm not going to rule on this today because
I need to read the plea; but here's my concern, to be
honest with you. This plea agreement calls for a 30 year
sentence.

     DEFENDANT MR. RAIFSNIDER: Right.

     THE COURT: And I've had too many people who have come
in here and entered a plea of guilty, told me they were
guilty, told me they were satisfied with their lawyer, told
me they knew what they were doing and this is what they
wanted to do, that it was their decision, it wasn't their
lawyer's decision, all of this assurance that this is what
they wanted to do and they understood all their rights and
within six months after they got into the penitentiary, I
get a 2255 motion claiming that their lawyer's incompetent,
that he hadn't advised them properly, ta-dah, ta-dah,
ta-dah. Almost invariably those are denied. But they take
my time.

     DEFENDANT MR. RAIFSNIDER: Right.

     THE COURT: It's almost more efficient for me to say,
all right, if the man wants to withdraw his plea, even
though I don't think it's in his best interest to withdraw
his plea, or that he's really shown me good grounds for
withdrawing his plea, that it's just easier to let the

                            -11-

person, if they indicate they want to withdraw their plea, withdraw it and have a trial. I've had a couple of cases where that's been a disastrous decision on the part of the defendant.

DEFENDANT MR. RAIFSNIDER: Right.

* * *

THE COURT: But I want you to tell me today because it will enter into my decision. Is this what you want to do truly, withdraw your plea?

DEFENDANT MR.. RAIFSNIDER: No, I don't. I don't want to withdraw my plea.

THE COURT: I mean withdraw your motion to withdraw your plea?

DEFENDANT MR. RAIFSNIDER: Yes.

THE COURT: And that's your decision?

DEFENDANT MR. RAIFSNIDER: Yes, that's my decision. That's the opinion I came to with my attorney when he visited with me upstairs. I asked Mr. Gradert that I felt that it would just be in my best interest to go ahead and withdraw the withdrawal of the plea.

THE COURT: Are you satisfied with his advice?

DEFENDANT MR. RAIFSNIDER: Yes, I am.

THE COURT: All right. Well, what I'm going to do is I'm going to take this under advisement probably for a week or so and I'll get you back in here and let you know what I'm going to do. But I'm relying on your telling me here today in court that I won't be -- if I accept your plea and

-12-

sentence you, that I won't be hearing from you in six months or something claiming that you didn't know what you were doing, that Mr. Gradert was a bad lawyer, et cetera, et cetera, and that you now want a trial.

DEFENDANT MR. RAIFSNIDER: Right. I understand that, Your Honor.

### Sentencing

On July 8, 2005, the case came on for sentencing. Defendant appeared with Mr. Gradert. Doc. 57 is a copy of the sentencing transcript. Nothing more was said regarding withdrawal of the pleas. Defendant reiterated that he was satisfied with his counsel. The court approved the Rule 11(c)(1)(C) plea agreements and imposed concurrent terms of 30 years imprisonment on the Kansas and Illinois cases.

Defendant initially sought leave to appeal out of time but later withdrew his appeal (Docs. 20-24). In any event, as the court explained to defendant at the time he was sentenced, because of the Rule 11(c)(1)(C) pleas, the Court of Appeals lacked jurisdiction over any appeal. United States v. Silva, 413 F.3d 1283 (10th Cir. 2005).

### Evidentiary Hearing

At the March 5 evidentiary hearing, defendant testified that Mr. Gradert was ineffective in the following ways:

1. He failed to contest defendant's "kidnapping" from Oklahoma and his failure to receive extradition or Fed. R. Crim. P. 20 hearings in Oklahoma.

2. He failed to file a motion to suppress the items found in defendant's car after his arrest in Oklahoma, items which

-13-

allegedly were "planted" by authorities. Defendant did not specify (and as far as can be determined from his voluminous submissions, he has never specified) what the items were. Defendant's ground for suppression, as stated in one of his written submissions, was that the search was illegal because it was conducted by a state, rather than federal, law enforcement officer.

3. He failed to provide defendant with "discovery." Defendant expressed his belief that had he been provided the "discovery" he might have decided to go to trial and that there was a "high probability" that he would have been acquitted. The only "discovery" mentioned by defendant was DNA and fingerprint evidence.

4. He failed to provide discovery pertaining to the Illinois charges, told defendant he would receive 95-115 months if he entered a Rule 20 plea to the Illinois charges and that his sentence on the Kansas charges would have been "less." Defendant did not explain what he meant by "less."

5. He would not allow defendant to see the presentence report and failed to adequately investigate defendant's criminal history.

Finally, defendant asserted that he pled guilty because he was afraid that if he went to trial, he would receive a sentence of life plus 30 years.

Mr. Gradert testified, in substance, that he investigated and researched defendant's complaint about being "kidnapped" and determined that there was no legal impediment to bringing defendant

-14-

to Kansas, where he appeared before the magistrate judge within 48 hours.  Based on his investigation, he decided not to file a motion to suppress.  He showed all Fed. R. Crim. P. 16 disclosures to defendant and he interviewed the victims.  There was no fingerprint and DNA evidence to disclose.  He believed that defendant qualified as a career offender and, if convicted following a trial, would receive consecutive life sentences plus additional time for the other Kansas charges.  He negotiated a Fed. R. Crim. P. 11(c)(1)(C) plea for 30 years to the Kansas charges and separate Rule 20 plea to the Illinois charges.  Although he admitted "surprise" when defendant was sentenced to 30 years concurrent on the Illinois charges, rather than the lesser sentence he estimated under the advisory guidelines, the Illinois plea agreement did not specify a particular sentence, only that the time would run concurrent with the Kansas sentence.[2]

## Discussion

### Grounds 2, 3 and 4

The claims which form the basis of grounds 2, 3 and 4 of defendant's motion can be disposed of summarily.  Taken together, defendant asserts that after he was arrested in Bartlesville, Oklahoma by state authorities, he was "kidnapped" and brought to Kansas without the benefit of some sort of extradition proceeding or a Rule 20 hearing.  He asserts that items found in a search of his car by a city police officer were illegally seized because the "officer conducting the search had no lawful jurisdiction being it was a Federal crime

---

[2]Mr. Gradert also filed an affidavit which explains in detail his representation of defendant and which credibly refutes defendant's claims of ineffective assistance.  (Doc. 43, Attachment A).

-15-

committed not State." He concludes by contending that because he was "kidnapped," this court lacked jurisdiction over his case.

The answer to these claims is that it matters not how defendant was brought to Kansas to face federal charges in this court. In <u>Frisbie v. Collins</u>, 342 U.S. 519, 522, 72 S. Ct. 509, 96 L.Ed. 541 (1952), the Supreme Court stated: "This court has never departed from the rule announced in <u>Ker v. Illinois</u>, 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" <u>Frisbie</u> involved a case in which the defendant had been kidnapped in Chicago by Michigan officers and brought to trial in Michigan. The Supreme Court revisited <u>Frisbie</u> in <u>United States v. Alvarez-Machain</u>, 504 U.S. 655, 119 L. Ed. 2d 441, 112 S. Ct. 2188 (1992) which involved a defendant forcibly kidnapped in Mexico and brought to Texas for trial. The court held that the federal court in Texas had jurisdiction to try the defendant, even if defendant's abduction violated an Extradition Treaty between the United States and Mexico. The Tenth Circuit recently commented upon what it called the <u>Ker-Frisbie</u> doctrine in <u>United States v. Olivares-Rangel</u>, 458 F.3d 1104, 1110 (2006) holding that under the <u>Ker-Frisbie</u> doctrine, illegal police activity affects only the admissibility of evidence; it does not affect the jurisdiction of the trial court or otherwise serve as a basis for dismissing the prosecution.

Thus, defendant's arguments that this court lacked jurisdiction because he was "kidnapped" in Oklahoma are without merit. His arguments regarding extradition are equally without merit for the

simple reason that the concept of extradition does not apply in the context of a federal prosecution where a defendant is moved from one state to another to answer federal criminal charges. Rule 20, of course, is inapplicable. Finally, defendant's arguments regarding items seized from his car fail if for no other reason than he entered a plea of guilty, thereby waiving all non-jurisdictional defenses. United States v. Salazar, 323 F.3d 852, 856 (10th Cir. 2003). In any event, it is unclear whether any evidence was seized which would have been relevant had defendant gone to trial. His claim that a motion to suppress should have been filed because his car was searched by a state, rather than federal, officer is frivolous. Defendant's testimony that unspecified items were "planted" in his car is unsupported and patently incredible. Obviously, Mr. Gradert was not ineffective for failing to raise these claims.

Ground 1, Ineffective Assistance of Counsel

and the Need For a Hearing

When a defendant challenges a guilty plea based on ineffective assistance of counsel, the familiar standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), requires a defendant to show that: (1) "counsel's performance was deficient" and marked by "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Six Amendment," and (2) that "the deficient performance prejudiced the defense," id. at 687, such that "but for counsel's errors, [defendant] would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985).

The threshold question presented by the files and records was whether an evidentiary hearing was necessary. Section 2255 provides that unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, a hearing shall be held. One circuit court recently has observed that evidentiary hearings are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted. <u>Moreno-Moarales v. United States</u>, 334 F.3d 140, 145 (1st Cir. 2003). Unfortunately, as noted below, this may not be the rule in this circuit.

Whether to hold an evidentiary hearing is not an inconsequential question. Section 2255 motions are frequent occurrences, even when they are waived as part of a plea agreement. They are time consuming for the court and, if a hearing is ordered, are an additional expense to the taxpayer because counsel must be appointed for the movant who qualifies (and most do). Rules Governing Section 2255 Proceedings, Rule 8(c). Finally, § 2255 motions which are based upon claims of ineffective counsel (and most are) can have a deleterious effect on the criminal defense bar. <u>United States v. Galloway</u>, 56 F.3d 1239, 1242 n.2 (10th Cir. 1996). There is no reason to suppose that federal public defenders are immune to this effect.

In order for a guilty plea to be valid, it must be knowingly, intelligently and voluntarily made. These requirements are taken seriously by this court. Therefore, when a defendant pleads guilty, he or she does so by way of a written plea agreement and a written petition, both of which spell out in considerable detail the maximum sentence, defendant's rights and those he or she will give up by

-18-

pleading guilty.  In addition, the court conducts an extensive Rule 11 colloquy with the defendant.  The defendant's written and oral statements and responses are given under oath.  The truth and accuracy of a defendant's statements made in connection with Rule 11 proceedings are regarded as conclusive in the absence of a believable reason justifying departure from their apparent truth.  <u>United States v. Bambulas</u>, 571 F.2d 525, 526 (10th Cir. 1978).[3]  <u>Bambulas</u> has been cited with approval in many succeeding Tenth Circuit cases, one of the most recent of which is <u>United States v. Fields</u>, 157 Fed. Appx. 40, 42 (10th Cir. 2005).

The files and records in this case conclusively show that defendant entered guilty pleas fully in accordance with the aforesaid procedures.  Defendant assured the court, <u>under oath</u>, that he had committed the crimes to which he was pleading guilty, that his decision to plead guilty was his own, that he understood the consequences of the Kansas plea (an agreed-upon 30 year sentence) and that the Illinois sentence would run concurrent with the Kansas sentence, and that he was satisfied with his counsel.  Even without considering his agreement to waive his rights under § 2255, one reasonably could conclude that the files and records conclusively show that defendant would not be entitled to relief on the alleged grounds that he pled guilty out of fear and because his counsel was ineffective. But if those factors are not enough, add from the files and records that defendant is a career criminal who is familiar with the criminal justice system, that the grounds he raises not only were

_____

[3]The Assistant United States Attorney representing the government was now-Circuit Judge Mary Briscoe.

-19-

never mentioned in his appearances before the court but instead are directly contrary to his sworn statements to the court and finally, that defendant has described himself in ways which suggest he has personality flaws beyond those of merely being a criminal which cast considerable doubt on the truth of his claims. <u>Surely</u> all these facts would militate against the necessity for hearing. Right?

Wrong. A panel of the Tenth Circuit has stated that the mere fact that a defendant's allegations may be improbable or unbelievable will not serve as a basis to deny a hearing. <u>United States v. Gonzalez</u>, 98 Fed. Appx. 825, 831-32 (10th Cir. 2004). <u>Gonzalez</u> does not cite, much less distinguish, the <u>Bambulas</u> line of cases. In the real world of busy district court dockets and limited judicial resources, the panel's words create problems. If the truth of a defendant's statements in a Rule 11 proceeding are conclusive in the absence of a <u>believable</u> reason justifying a departure from their apparent truth, should a defendant nevertheless be able to secure a hearing with unbelievable and improbable claims?[4] Is a district court supposed to ignore the fact that a defendant's allegations are patently unbelievable because they are contrary to sworn statements and/or the files and records in the case?[5] Is a hearing required

---

[4]Black's Law Dictionary, 6th edition, defines improbable as "unlikely to be true, or to occur, not to be readily believed." Unbelievable is not defined, probably because it is self-defining.

[5]For example, defendant contends that during the hearing of June 20, 2005 regarding his motion to withdraw his plea, this court supposedly told defendant that " . . . if I choose to with draw [sic] my plea I would go to trial and lose and get 2 life plus thirty years and asked me if I wanted to continue to withdraw my plea. I was in fear for my life and intimidated by the judge that continued on with my plea." No such statement by the court appears in the transcript of the hearing (Doc. 56).

when, as here, a defendant's claims suffer from all the deficiencies mentioned and, in addition, accuse an attorney of ineffectiveness who has appeared before the court hundreds of times and has always effectively represented his clients?   If <u>Gonzalez</u> states the controlling law, the answers to all these questions would seem to be "yes."   Therefore, with great reluctance, the court held an evidentiary hearing.  Having done so, the court now makes its findings of fact and conclusions of law as required by § 2255.

Findings of Fact

1.   Defendant was ably represented throughout this case by qualified, competent counsel.  There is no evidence that Mr. Gradert's performance was deficient in any manner.

2.   Defendant is familiar with the criminal justice system because he is a career criminal and he has deliberately abused the system by filing a § 2255 motion which lacks any semblance of merit.

3.   Defendant swore to written plea agreements and petitions to plead guilty in which he acknowledged his understanding of the charges, the penalties, his commission of the crimes, his rights, the rights he was giving up by pleading guilty, that his pleas were his decision and that he was satisfied with Mr. Gradert's representation, among other things.

4.   Defendant acknowledged these same things orally under oath in open court.

5.   Defendant has presented no credible evidence that he pled guilty "out of fear."

6.   Defendant agreed to a 30 year sentence in the District of Kansas case and to a concurrent sentence in the Central District of

Illinois case.    Defendant's sentences are consistent with his agreement.

7.    Defendant's claims in support of his § 2255 motion and his testimony at the evidentiary hearing are contrary to his sworn written and oral statements on material matters.    They are improbable and unbelievable.  Defendant, at best, is a liar and a very poor one, at that.

<u>Conclusions of Law</u>

1.    Defendant has failed to meet his burden to demonstrate entitlement to relief under § 2255.

2.    Defendant's § 2255 motion (Docs. 38, 39 and 49) is denied.

<u>Government's Motion to Dismiss</u>

A plea agreement which waives post-conviction rights does not waive the right to bring a § 2255 petition based on ineffective assistance of counsel claims challenging the validity of the plea or the waiver.  <u>United States v. Cockerham</u>, 237 F.3d 1187 (10th Cir. 2001).   In this case, as already noted, defendant assured the court that he understood the plea agreements (including the waiver), that it was his decision to enter into the agreements and that he was satisfied with Mr. Gradert's representation. To the extent that he now contends to the contrary, the court finds his testimony to be unworthy of belief.

Therefore, the § 2255 waivers contained in the plea agreements and the government's motion to dismiss is sustained as an additional ground to dismiss defendant's § 2255 motion.

IT IS SO ORDERED.

Dated this __20th__ day of March 2007, at Wichita, Kansas.

-22-

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE